UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| INDIANA PROTECTION AND ADVOCACY SERVICES COMMISSION,  *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 4:16-cv-29-SEB-DML |
| INDIANA SECRETARY OF STATE, in her official capacity, *et al.*. | ) ) ) | |
| Defendants. | ) ) | |

**Memorandum in Support of Motion for Preliminary Injunction**

**Introduction**

In Indiana, a voter must generally reside in his or her precinct community before voting. Ind. Code § 3-7-13-1.  The General Assembly has adopted a specific statute, Indiana Code § 3-5-5-17, which provides, without exception, that a person adjudged mentally ill and committed to one of Indiana's state institutions for those with a mental illness does not gain residency in the precinct community where the institution is located.  For plaintiff Patricia Featherston, and many other persons who are committed mentally ill residents of one of Indiana's five adult mental health institutions, this statute greatly interferes with their fundamental right to vote. Patients may reside in the institutions for years and some persons simply have no other place in Indiana where they can legally vote.  Others could possibly vote elsewhere, but reasonably view the community in which the hospital is located as their home community and naturally desire to participate in the political life of that community.

Indiana law currently provides that many other persons who are not living in traditional homes nonetheless establish residence where those non-traditional homes are. Thus, persons

living in veterans homes, those who are attending post-secondary institutions, and those who live in non-permanent non-traditional residences may all obtain residence in the communities where the homes, institutions, or residences are located. Ind. Code §§ 3-5-5-7(b), 3-5-5-16–18.  The General Assembly has singled institutionalized mentally ill persons for unique treatment and a unique disability – they are not allowed to vote where they actually live.  This severely burdens their right to vote, without justification, and is unconstitutional.  It also violates equal protection as it irrationally discriminates against a discrete subset of mentally ill persons – those who have been institutionalized.  This discrimination also violates both the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq*. and the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.*

A preliminary injunction should be issued at this point as plaintiff Patricia Featherston and the class and sub-class of persons she seeks to represent are all faced with irreparable harm by virtue of the defendants' unlawful actions and all the other requirements for the grant of a preliminary injunction are met. The May 2016 primary election is set for Tuesday, May 3, and in order to vote in the primary, a potential voter must be properly registered by April 4, 2016. Ind. Code § 3-7-13-10. The injunction must prevent the state defendants from enforcing the law and must prevent the Clerk of Jefferson County from purging the voter registrations of class members residing at Madison State Hospital who claim residence there.  Further, the Clerk must be enjoined to restore to a valid status the registrations that she has removed.[1]

**The preliminary injunction standard**

The standard in the Seventh Circuit for the granting of a preliminary injunction is clear. In order to determine whether a preliminary injunction should be granted, the Court weighs several factors:

---

[1]    Although the class has not yet been certified, any preliminary injunction should be applied to all of the members of the putative class and subclass as the Indiana Protection and Advocacy Services Commission represents the interests of all institutionalized mentally ill persons in Indiana. *See infra.*

(1) whether the plaintiff has established a prima facie case, thus demonstrating at least a reasonable likelihood of success at trial;

(2) whether the plaintiff's remedies at law are inadequate, thus causing irreparable harm pending the resolution of the substantive action if the injunction does not issue;

(3) whether the threatened injury to the plaintiff outweighs the threatened harm the grant of the injunction may inflict on the defendant; and

(4) whether, by the grant of the preliminary injunction, the public interest would be disserved.

*See, e.g.*, *Baja Contractors, Inc. v. City of Chicago*, 830 F.2d 667, 675 (7th Cir. 1987). The heart of this test, however, is "a comparison of the likelihood, and the gravity of two types of error: erroneously granting a preliminary injunction, and erroneously denying it." *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 590 (7th Cir. 1984).

**Legal and factual background**

Plaintiffs believe that the following facts will be adduced at the preliminary injunction hearing in this matter.[2]

*Legal background*

As a general rule, "residence" for purposes of voting in Indiana means the place "(1) where a person has the person's true, fixed, and permanent home and principal establishment; and (2) to which the person has, whenever absent, the intention of returning." Ind. Code § 3-5-2-42.5. However, recognizing that there are many situations where a person may physically be away from his or her "residence", or where "residence" is difficult to assess, Indiana law provides various standards for determining residency. Ind. Code § 3-5-5-1, *et seq.* Thus, various statutory provisions provide that:

---

[2]     Because discovery has not yet been conducted in this case, the plaintiffs reserve the right to present additional evidence once discovery occurs.

- subject to Indiana Code § 3-5-5-6[3], a student attending an Indiana postsecondary institution may claim residence at the address of the institution. Ind. Code § 3-5-5-7(b)

- subject to Indiana Code § 3-5-5-6, a person will lose Indiana residency if he or she is outside of Indiana with the intention of making the new state the person's residence or with the intention of remaining outside of Indiana for an indefinite time. Ind. Code §§ 3-5-5-8, 3-5-5-9.

- subject to Indiana Code § 3-5-5-6, a person physically present in another precinct in Indiana with the intention of making the new precinct the person's residence will lose residency in the original precinct. Ind. Code § 3-5-5-10.

- subject to Indiana Code § 3-5-5-6, the place where the person's immediate family[4] permanently resides is the person's residence unless the person resides away from his or her family and intends to remain at the new location. Ind. Code §§ 3-5-5-11, 3-5-5-13. Subject to Indiana Code § 3-5-5-6, this includes a married person who establishes a residence separate from his or her spouse. Ind. Code § 3-5-5-14. Subject to Indiana Code § 3-5-5-6, a person who is not married and does not have immediate family resides where "the person usually sleeps if that is the intent of the person, and the person engages in conduct to carry out that intent. Ind. Code § 3-5-5-15.

As noted above, these statutory provisions all contain the verbiage, "[s]ubject to section 6 of this chapter," thereby establishing presumptions of residency that the person can rebut if he or she has an intent to reside elsewhere. Ind. Code § 3-5-5-6. Additionally, there are two situations where the General Assembly has specifically noted that residency shall be established:

- "A person who resides in a veterans home is a resident of the precinct in which the home is located." Ind. Code § 3-5-5-16.

- "Notwithstanding IC 3-5-2-42.5, an individual with a nontraditional residence whose residence is within a precinct, but is not fixed or permanent, resides in that precinct." Ind. Code § 3-5-5-18.

And, the statute provides one specific situation where a person is barred from claiming residence where he or she is located, regardless of the circumstances. Thus, the challenged

---

[3]        Indiana Code § 3-5-5-6(a) provides that "Sections 7 through 17 of this chapter establish presumptions regarding the residency of a person in a precinct. A person can rebut these presumptions by demonstrating intent to reside in another precinct and conduct taken to implement that intent."

[4]        "Immediate family" is defined to include "spouse, children, stepchildren, parents, or grandparents of the individual." Ind. Code § 3-5-5-0.5.

statute, Indiana Code § 3-5-5-17, provides, in its entirety, that:

A person who is:

(1)     adjudged mentally ill; and

(2)     committed to an institution for individuals with a mental illness;

does not gain residency in the precinct in which the institution is located.

This section does not contain the language "subject to section 6 of this chapter," and therefore

represents an absolute prohibition on a person gaining residency where the facility is located.[5]

It is a felony for a person to vote in a precinct where the person knows that he or she is

not registered to vote. Ind. Code § 3-14-2-11(a).

*Facts*

People who are mentally ill and meet statutory standards may be involuntarily committed

on a temporary commitment of ninety days, Ind. Code § 12-26-6-1, or on a regular commitment

of an indefinite duration, Ind. Code § 12-26-7-5.  There are five adult state-operated facilities in

Indiana: Richmond State Hospital, Logansport State Hospital, Larue Carter Hospital, Madison

State Hospital, and Evansville State Hospital that house mentally ill persons.  At the current time

there are approximately 647 persons housed in the five facilities. Nearly all of those individuals

are involuntarily committed and many of them have been committed for years or even decades.

These individuals might not have a residence outside of the facility where they live, and they

might not have a spouse, child, stepchild, parent, or grandparent in Indiana.

Named-plaintiff Patricia Featherston is an adult who has been adjudged mentally ill and

involuntarily committed under Indiana law and has been placed at Madison State Hospital since

---

[5]     This is also clear from the structure of Indiana Code § 3-5-5-6 that allows a person to rebut the presumption of residency by demonstrating an intent to reside elsewhere.  This makes no sense when applied to Indiana Code § 3-5-5-17 as the statue creates no presumption of residency but merely prohibits residency.

approximately 2006.  She was committed to other Indiana state psychiatric institutions prior to that time. She has been registered to vote in the precinct where Madison State Hospital is located and she has voted in both national and local elections.  To the best of her knowledge she remains registered to vote with the hospital as her address.

Ms. Featherston feels that Madison State Hospital is her home and that the community where the facility is located is her home community, she is invested in her community.  She goes on outings there, goes out to eat, visits local doctors and has received medical care at the local hospital.  She desires to have a say in her community through the electoral process and therefore wishes to continue to be registered to vote with Madison State Hospital as her address. Moreover, Ms. Featherston has no ties to any other Indiana community. She has no spouse, children, stepchildren, parents, or grandparents living in Indiana.

Ms. Featherston is not unique.  As of the last election there were at least 21 committed mentally ill patients at Madison State Hospital who were registered to vote, and who voted, using the hospital as their address.  However, the Clerk of Jefferson County, the county's chief election official, has specified that she has been informed by an official within the office of the Indiana Secretary of State that Indiana Code § 3-5-5-17 precludes these persons from using Madison State Hospital as their residence for the purposes of voting. Staff at Madison State Hospital have been instructed that these persons must register and vote elsewhere.

In addition to Ms. Featherston, this action is also brought by Indiana Protection and Advocacy Services Commission ("IPAS"), an independent state agency funded solely by federal funds, which is charged with, among other things, protecting and advocating for the rights of individuals with mental illness.  42 U.S.C. §§ 10804, 10805.  IPAS not only represents Ms. Featherston, but also represents the interests of other persons with mental illness committed to

one of the five state institutions who either are currently registered to vote with the institution as their residence or who wish to so register in the future.

**Legal Argument**

**I.      The plaintiffs will prevail on the merits of their claims[6]**

**A.      Indiana Code § 3-5-5-17 unconstitutionally burdens the right to vote**

**1.      Although the right to vote is a fundamental right, the constitutionality of any burden depends on a balancing analysis that examines the severity of the burden and the justifications for it**

"The Constitution does not in so many words confer a right to vote, though it has been held to do so implicitly." *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004) (citing, among other cases, *Harper v. Virginia State Bd. of Elections,* 383 U.S. 663, 665-66 (1966); *Reynolds v. Sims*, 377 U.S. 533, 554-55 (1964)). However, on numerous occasions the Supreme Court has

---

[6]      Under both federal and state law IPAS has the authority to pursue legal action to protect the rights of individuals who are mentally ill.  42 U.S.C. § 10805(a)(1)(B); Ind. Code § 12-28-1-12(2). This has lead numerous courts to recognize that under the principles of organizational standing noted in *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977), federally funded protection and advocacy organizations like IPAS have standing to represent the mentally ill persons that they serve.  *See, e.g., Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1110-1113 (9th Cir. 2003); *Doe v. Stincer*, 175 F.3d 879, 884-886 (11th Cir. 1999); *Wilson v. Thomas*, 43 F. Supp. 3d 628, 632 (E.D. N.C. 2014); *New Jersey Protection & Advocacy, Inc. v. New Jersey Department of Education*, 563 F.Supp.2d 474, 482-84 (D.N.J. 2008);  *Joseph S. v. Hogan*, 561 F.Supp.2d 280, 305-307 (E.D.N.Y. 2008); *Procurador de Personas Con Impedimentos v. Municipality of San Juan*, 541 F.Supp.2d 468, 471-73 (D.P.R. 2008); *University Legal Services, Inc. v. St. Elizabeths Hospital*, No. Civ. 105CV00585TFH, 2005 WL 3275915, *4-*5 (D.D.C. Jul. 22, 2005); *Protection & Advocacy for Persons with Disabilities v. Armstrong*, 266 F.Supp.2d 303, 311-12 (D. Conn. 2003); *Risinger v. Concannon*, 117 F.Supp.2d 61, 68-71 (D. Me. 2000); *Tennessee Protection and Advocacy, Inc. v. Metropolitan Government of Nashville and Davidson County*, No. 3-95-0793, 1995 WL 1055174, *1 (M.D. Tenn. Nov. 14, 1995); *Trautz v. Weisman*, 846 F.Supp. 1160, 1162-63 (S.D.N.Y. 1994).  Indeed, then Chief Judge Hamilton noted that IPAS "easily satisfie[d]" the constitutional criteria for standing when it sought  to represent mentally ill persons imprisoned within the Indiana Department of Correction. *Indiana Protection and Advocacy Services Commission v, Commissioner, Indiana Department of Correction*, 642 F. Supp. 2d 872, 878 (S.D. Ind. 2009).

And, both the United States Supreme Court and the Seventh Circuit have made it clear that despite the fact that IPAS is a state agency, albeit entirely federally funded, it may sue the state for injunctive and declaratory relief. *See Virginia Office for Protection and Advocacy v. Stewart*, 563 U.S. 247(2011); *Indiana Protection and Advocacy Services v. Indiana Family and Social Services Administration*, 603 F.3d 365 (7th Cir. 2010) (en banc).

noted the fundamental importance of the right to vote. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S 1, 17 (1964). Therefore, "for reasons too self-evident to warrant amplification here, we have often reiterated that voting is of the most fundamental significance under our constitutional structure." *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979) (citing *Wesberry,* 376 U.S. at 17; *Reynolds*, 377 U.S. at 55; *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972)).  The right is implicit in various constitutional provisions, including the Equal Protection and Due Process Clauses as well as the First Amendment. *See Anderson v. Celebrezze*, 460 U.S. 780, 786 n.7 (1983).

However, the Supreme Court has stressed that not every restriction on the right to vote is either unconstitutional or subject to strict scrutiny. "Election laws will invariably impose some burden on individual voters" and to impose strict scrutiny on every regulation on the franchise would "tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). Therefore a more "flexible standard" applies where a court must

> weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against the "precise interests put forward by the State as justification for the burden  imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Id*. at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788-89 (1983)). This balance means that, on the one hand, if the right to vote is "subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Id.* (internal citations omitted).  And, on the other extreme, "[w]hen the state election law imposes only reasonable,

nondiscriminatory restrictions upon the rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." *Common Cause Indiana v. Individual Members of the Indiana Election Com'n*, 800 F.3d 913, 917 (7th Cir. 2015) (internal quotations and citations omitted).  Between these two poles, where a substantial burden on the right to vote is present – one that is greater than a "reasonable, nondiscriminatory restriction" but less than a "severe burden" – a court is to "weigh the burden on voters against the state's asserted justifications and 'make the hard judgment that our adversary system demands.'"  *Obama for America v. Husted*, 697 F.3d 423, 429 (6th Cir. 2012) (quoting *Crawford v. Marion County Election Board*, 553 U.S. 181, 190 (2008) (Stevens, J) (plurality opinion).

### 2.    The challenged statute severely burdens the right to vote

Ms. Featherston's situation demonstrates one manner in which the challenged statute severely burdens the right to vote.  As noted, Indiana law generally provides that a person's residence is where his or her immediate family[7] resides, unless the person is living in another place away from his or her immediate family and intends to remain there. Ind. Code §§ 3-5-5-11, 3-5-5-13. Yet, the evidence will demonstrate that Ms. Featherston has no immediate family in Indiana and has no other place she can legally call a residence other than Madison State Hospital, where she has lived for a decade.  The challenged statute therefore absolutely disenfranchises her.  There is no more severe of a burden.  *See, e.g., Service Employees Intern. Union Local 1 v. Husted*, 906 F. Supp. 2d 745, 750 (S.D. Ohio 2012), *stay granted*, 698 F.3d 341 (6th Cir. 2012), *appeal dismissed as moot*, 531 Fed. Appx. 755 (6th Cir. 2013) ("Disqualification of one's ballot is no victimless legal abstraction; it is disenfranchisement, the loss of the fundamental right to participate in the democratic process. To disenfranchise a single voter is a matter for grave

---

[7]      As noted previously, "immediate family" is defined to include "spouse, children, stepchildren, parents, or grandparents of the individual." Ind. Code § 3-5-5-0.5.

concern.").

The burden on voting rights imposed by the statute manifests itself in other ways as well. Because many members of the class have been residents of their institutions for some time they will naturally come to consider the institutions and the community in which the institutions are located as their homes. They wish to vote where their homes are and they wish to be able to influence their community. However, the statute denies them this opportunity. This precludes them from having an effective voice in their community. This obviously burdens the right to vote.

In *Evans v. Cornman*, 398 U.S. 419 (1970), the Supreme Court held that interpreting Maryland's voter-residency law to render non-residents persons living on the grounds of the National Institutes of Health ("NIH"), a federal enclave within the state, was unconstitutional. The Court noted that "there are numerous and vital ways in which NIH residents are affected by electoral decisions." *Id.* at 424. The Court concluded that:

> [i]n their day-to-day affairs, residents of the NIH grounds are just as interested in and connected with electoral decisions as they were prior to 1953 when the area came under federal jurisdiction and as are their neighbors who live off the enclave. In nearly every election, federal, state, and local, for offices from the Presidency to the school board, and on the entire variety of other ballot propositions, appellees have a stake equal to that of other Maryland residents. As the District Court concluded, they are entitled under the Fourteenth Amendment to protect that stake by exercising the equal right to vote.

*Id.* at 426. Similarly, members of the class here have a stake in their communities, the areas where the institutions are located. The challenged statute denies them this stake. This is a burden on the right to vote.

### 3. The burdens imposed by the challenged statute on the right to vote cannot be justified

The effect of the statue on some potential voters who are committed to state psychiatric institutions is to deny them any opportunity to vote. Ms. Featherston falls into this category. The

burden on the right to vote for these persons is absolute and it is therefore incumbent on the defendants to justify this burden by demonstrating a narrowly tailored compelling governmental interest. *Supra*.  It is impossible to hypothesize an interest that would justify denying an otherwise eligible voter the right and ability to vote somewhere.  *See, e.g., Pitts v. Black*, 608 F. Supp. 696, 708-710 (S.D.N.Y. 1984) (concluding that New York election law that effectively disenfranchised homeless persons because they had no "residence" was unconstitutional).

There is also no justification for the burden imposed on other class members who may still be able under Indiana law to claim residence in a community other than the one where the institution is located. It is true that these persons may be able to vote, albeit in communities to which they are strangers. But, as noted above, this imposes a burden and the defendants must justify the burden. "However slight that burden [on voting rights] may appear  . . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford*, 553 U.S. at 191 (plurality opinion) (internal citation omitted).  A court must also consider "the extent to which these interests make it necessary to burden the plaintiff's rights." *Anderson*, 460 U.S. at 789. It is, again, difficult to hypothesize a state interest here.  Certainly, Indiana has "the power to require that voters be *bona fide* residents of the relevant political subdivision." *Dunn v. Blumstein,* 405 U.S. 330, 343 (1972). However, Ms. Featherston and the members of the class are not transients – they are persons who live in the communities where the state institutions are located. There is no justification for denying them the right to vote where they live.

Plaintiffs will therefore be able to demonstrate that the challenged statute is unconstitutional as violating the fundamental right to vote.

**B.**      **The challenged statute violates equal protection**

Indiana "is free to take reasonable steps . . . to see that all applicants for registration to vote actually fulfill the requirement of bona fide residence." *Bell v. Marinko*, 367 F.3d 588, 592 (6th Cir. 2004). However, in creating the residency requirements Indiana, must, of course, comply with equal protection. *Cf., Baskin v. Bogan*, 983 F. Supp. 2d 1021, 1028 (S.D. Ind. 2014), *appeal dismissed* ("As this court has recognized before, marriage and domestic relations are traditionally left to the states; however, the restriction put in place by the state must comply with the United States Constitution's guarantee of equal protection of the laws."). The prohibition on residency erected by Indiana Code § 3-5-5-17 violates equal protection.

"The Equal Protection Clause of the Fourteenth Amendment commands that no state shall 'deny to any person within its jurisdiction the equal protection of the laws,' which essentially is a directi[ve] that all persons similarly situated should be treated alike." *Vision Church v. Village of Long Grove*, 468 F.3d 975, 1000 (7th Cir. 2006) (internal citation omitted). The first step in this analysis "is to identify the [defendants'] classification of groups," which can be accomplished by showing that a statute "imposes different burdens on different classes of people." *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 589 (9th Cir. 2008) (alteration in original) (citations omitted). Here, as stressed, the General Assembly has allowed post-secondary students temporarily away from their homes to claim residence in the communities where their schools are located. Ind. Code § 3-5-5-7(b). Persons who are confined in a veterans home are deemed to be residents of the precinct where the home is located. Ind. Code § 3-5-5-16. Persons with "nontraditional residence[s]" that are not "fixed or permanent" are considered to reside in the precinct where the "nontraditional residence" is located. Ind. Code § 3-5-5-18. But, persons who reside in state hospitals, certainly a nontraditional residence akin to a veterans home, and where they will reside with much more permanence than post-secondary school students, are not

allowed residency where they live. The challenged law therefore classifies similarly situated persons differently.

This, of course, does not end the equal protection analysis as the proper scrutiny to the classification must be applied. Heightened scrutiny is reserved for classification based on suspect classes such as race, alienage, or national origin as well as classifications interfering with fundamental rights. *Vision Church*, 468 F.3d at 1000.  In the absence of these factors, heightened scrutiny is replaced by the rational basis test that asks whether the government action is "rationally related to a legitimate governmental interest." *Monarch Beverage Co., Inc. v. Grubb*, --F. Supp. 3d --, No. 1:13-cv-01674-SEB-MJD, 2015 WL 5775519, *4 (S.D. Ind. Sept. 30, 2015).

The classification created by Indiana Code § 3-5-5-17 places Ms. Featherston and the class into a separate category based on their mental illness and commitment.  "[C]lassification according to mental illness has not been recognized as a suspect class which requires heightened or strict scrutiny under the equal protection clause." *Cospito v. Heckler*, 742 F.2d 72, 83 (3d Cir. 1984). However, even the low level of scrutiny demanded by the rational basis test, while admittedly not particularly rigorous, is not meaningless.  There are numerous examples where the Supreme Court has found that governmental action fails to satisfy this standard.  *See, e.g.*, *Romer v. Evans*, 517 U.S. 620, 626-35 (1996) (invalidating state constitutional amendment prohibiting governmental action to protect homosexual persons from discrimination because no rational basis supported the imposition of the special disability against one class of persons); *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 447-50 (1985) (invalidating zoning ordinance that excluded a group home for persons with intellectual disabilities because there was no rational basis to believe that the group home would pose any special threat to the city's

legitimate interests); *Plyler v. Doe*, 457 U.S. 202, 223-30 (1982) (invalidating statute withholding state educational funding for undocumented children because it is not rational to impute a parent's misdeeds to his or her child); *U.S. Dep't of Agriculture v. Moreno*, 413 U.S. 528, 533-38 (1973) (invalidating a statute denying food stamp benefits to households with unrelated persons because, *inter alia*, it was not rationally related to the ostensible purpose of preventing fraud). Thus, even when strict scrutiny is not applied, "courts examine, and sometimes reject, the rationale offered by the government for the challenged discrimination." *Baskin v. Bogan*, 766 F.3d 648, 654 (7th Cir. 2014), *cert denied*, 135 S.Ct. 316 (2014) (citing *Village of Willowbrook v. Olech*, 523 U.S. 562 (2000) (per curiam); *Cleburne*).

There is no rational reason for the classification created by the challenged statute. Persons who are likely to stay in the precinct for much briefer periods of time than patients committed to psychiatric institutions are allowed to vote in the precinct. Indeed, the Indiana Veterans Home provides not only "domiciliary care for honorably discharged Hoosier veterans and their spouses," but also provides "nursing care [and] short-term rehabilitation services." IN.gov, *Indiana Department of Veterans' Affairs - The Veterans Home*, http://www.in.gov/dva/2380.htm (last visited Feb, 25, 2016).[8] Yet, it is only the resident of a psychiatric institution who is denied the opportunity to vote in the community where he or she lives. In *Cleburne*, concerning a challenge to an ordinance that restricted group homes for the developmentally disabled, the Supreme Court, applying "rational basis" scrutiny, nevertheless

---

[8]     In addition to being a statement of the State of Indiana, a party in this case, this Court can take judicial notice of this government publication. *See, e.g., Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 332 n. 10 (1961) (taking judicial notice of a government publication); *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080-81 (7th Cir. 1997) (citing numerous cases for the proposition that a court can take judicial notice of matters of public record); *Brooklyn Heights Ass'n v. Nat'l Park Serv.*, 777 F. Supp. 2d 424, 432 n. 6 (E.D.N.Y. 2011) ("[T]he Court may take judicial notice of the [Brooklyn Bridge Park] website, which is a government publication.").

stressed that "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."  427 U.S. at 447.  The Court, in finding the ordinance to be unconstitutional concluded that it "rest[ed] on an irrational prejudice against the mentally retarded." *Id.* at 450.  Similarly, there is no rational basis for the distinctions drawn by the challenged statute, and it violates equal protection.

     **C.**    **The statute violates the Americans with Disabilities Act and the Rehabilitation Act**

Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12131, *et seq.*, prohibits disability-based discrimination in the administration of the "services, programs, or activities of a public entity."  42 U.S.C. § 12132.  The Rehabilitation Act of 1973, 29 U.S.C. § 791, *et seq.*, prohibits similar discrimination in the administration of "any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  The defendants in this case  are recipients of federal funds: if nothing else, Indiana has in effect a qualifying state plan under the Help America Vote Act of 2002, 52 U.S.C. § 20901, *et seq.*, which provides federal funds for the administration of elections and other election-related services.  *See* Indiana State Plan to Implement the Help America Vote Act of 2002: A Blueprint for Indiana Elections, *available at* http://www.in.gov/sos/elections/files/HAVA_State_Plan.Amended2009%283%29.

pdf (last visited Feb. 24, 2016).  And voting just as clearly constitutes a "service[], program[], or activit[y]" of a public entity, *see, e.g.*, *California Council of the Blind v. County of Alameda*, 985 F. Supp. 2d 1229, 1237-38 (N.D. Cal. 2013); indeed, the preamble to the ADA includes congressional findings that disability-based discrimination "persists in such critical areas as . . . voting," 42 U.S.C. § 12101(a)(3).  *Cf. Tennessee v. Lane*, 541 U.S. 509, 524 (2004) (noting, in holding that the ADA represents a valid exercise of Congress's enforcement power under the Fourteenth Amendment, that "Congress enacted Title II against a backdrop of pervasive unequal

treatment in the administration of state services and programs, including systemic deprivations of fundamental rights," and describing the right to vote as such a "fundamental right[]" of which persons with disabilities had historically been deprived).[9]

In order to prevail on the merits of their claim under the ADA, the plaintiffs must demonstrate (a) that they are disabled, (b) that they are otherwise qualified to vote in the counties where the state institutions are located, and (c) that they are being subjected to discrimination. *See, e.g.*, *Kerrigan v. Philadelphia Bd. of Elec.*, No. 07-687, 2008 WL 3562521, at *9-10 (E.D. Pa. Aug. 14, 2008).  The first two prongs of this test may not be seriously contested.  Persons who are involuntarily institutionalized are housed in state institutions precisely because the determination has been made that they are mentally ill and either dangerous or gravely disabled, *see* Ind. Code § 12-26-4-1 (immediate detention); Ind. Code § 12-26-5-1 (emergency detention); Ind. Code § 12-26-6-1 (temporary commitment); Ind. Code § 12-26-7-1 (regular commitment); and even those who are voluntarily committed must have a mental illness or symptoms of such an illness, *see* Ind. Code § 12-26-3-1.  "Mental illness" is defined as a psychiatric disorder that "substantially disturbs an individual's thinking, feeling, or behavior," and that "impairs the individual's ability to function," Ind. Code § 12-7-2-130(1), and, as such, these persons clearly have a "disability" under the ADA, *see* 42 U.S.C. § 12102(1)–(2) (defining the term to include persons with "a physical or mental impairment that substantially limits one or more major life

---

[9]     The Seventh Circuit has noted that "Title II of the ADA was modeled after § 504 of the Rehabilitation Act; the elements of claims under the two provisions are nearly identical, and precedent under one statute typically applies to the other."  *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 845 n.6 (7th Cir. 1999) (citations omitted).  The two claims are therefore treated simultaneously herein and, for ease of presentation, the statutes are collectively referenced simply as the "ADA."

It is also worth noting that Eleventh Amendment immunity is abrogated for purposes of the plaintiffs' claims under both the ADA and the Rehabilitation Act, *see* 42 U.S.C. § 2000d-7(a)(1) (Rehabilitation Act); 42 U.S.C. § 12202 (ADA).  The State of Indiana is therefore a proper defendant with respect to these claims.

[16]

activities" such as caring for oneself, learning, concentrating, thinking, or working). And, but for the challenged statute, residents of state institutions would be permitted to vote in the counties where the state institutions are located. *See* Ind. Code §§ 3-5-5-13, 15.

And it is likewise clear that the plaintiffs are being subjected to disability-based discrimination. A claim under the ADA "may be established by evidence that (1) the defendant intentionally acted on the basis of disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionately impacts disabled people." *Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006) (*en banc*) (quoting *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 847 (7th Cir. 1999)). The first such claim is referenced as either an "intentional discrimination" claim or a "disparate treatment" claim. *See, e.g.*, *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 573 (2d Cir. 2003).

The statute represents intentional discrimination on the basis of disability. Under the ADA, "[a] disparate treatment claim can be established . . . through proof of a facially discriminatory ordinance," which "specifically singles out the handicapped and applies different rules to them." *Jama Investments, LLC v. Incorporated County of Los Alamos*, No. CIV 04-1173 JB/ACT, 2006 WL 1228771, at *7 (D.N.M. Feb. 16, 2006) (addressing a corresponding claim under the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*) (citations omitted).[10] A defendant's motive is irrelevant to such a claim. *Id.* (citation omitted). In *Bangerter v. Orem City Corp.*, 46 F.3d 1491 (10th Cir. 1995)—a case brought under the Fair Housing Act—a municipality imposed a "single-family" zoning restriction whereby a group home for persons with disabilities could not operate in a residential district unless it (a) ensured that its residents were "properly

---

[10]    Because the ADA and the Fair Housing Act impose substantially similar requirements on governed entities, decisions rendered under one statute are regularly applied to cases brought under the other. *See, e.g.*, *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 782-83 (7th Cir. 2002); *Caron Found. of Florida, Inc. v. City of Delray Beach*, 879 F. Supp. 2d 1353, 1364 (S.D. Fla. 2012).

supervised on a twenty-four-hour basis" and (b) established "a community advisory committee through which all complaints and concerns of the neighbors could be addressed." *Id.* at 1495-96. Similar requirements, however, were not imposed on numerous other uses that did not meet the single-family requirements, including nursing homes, foster family care homes, convents, monasteries, rectories, and group homes for the elderly. *Id.* at 1495. Under these circumstances, the Tenth Circuit did not hesitate in concluding that the claim was properly brought as an intentional discrimination claim: The ordinance "facially single[s] out the handicapped and appl[ies] different rules to them. Thus, the discriminatory intent and purpose of the [ordinance] are apparent on [its] face." *Id.* at 1500.

Here, as in *Bangerter*, the statute applies only, and explicitly, to persons committed to a state institution as a result of their mental illness. *See* Ind. Code § 3-5-5-17. And this is so even though persons may reside in state institutions for years, if not decades, with no other residence. Meanwhile, residents of veterans homes are permitted to vote where the home is located, Ind. Code § 3-5-5-16; students attending postsecondary educational institutions may choose to vote either where their school is located or where they reside when away from school, Ind. Code § 3-5-5-7(b); and persons with a nontraditional residence that is not permanent may vote where that impermanent residence is located, Ind. Code § 3-5-5-18. The statute applies only to persons with disabilities; it applies to no one else. The statute represents intentional discrimination.

In *Bangerter*, the Tenth Circuit determined that, because the discriminatory ordinance was best viewed through the lens of a disparate treatment claim, both disparate-impact analysis and reasonable-accommodation analysis was inappropriate: because the plaintiff challenged "facially discriminatory actions and not the effects of facially neutral actions," the claim was deemed "one of disparate treatment and not disparate impact"; and a reasonable-accommodation

claim involves "changing some rule that is generally applicable so as to make its burden less onerous on the handicapped," whereas an ordinance "specifically directed at group homes for the handicapped" was not generally applicable.  46 F.3d at 1501-02 (internal quotation and citation omitted).  Here, too, the challenged statute is specifically targeted at persons who are committed to institutions on the basis of their disabilities.  Because this represents a clear instance of intentional discrimination, there is no need to view the statute through disparate-impact or reasonable-accommodation analysis.[11]

There simply is no justification for this intentional discrimination.  As noted above, the fact that other groups of persons are allowed to vote away from a traditional residence thwarts any possible justification for the discrimination here.  The statute violates the Americans with Disabilities Act and the Rehabilitation Act.

## III.    The other requirements for the grant of a preliminary injunction are met here and one should issue without bond

### A.    Ms. Featherston and the members of the putative class and subclass are being caused irreparable harm for which there is no adequate remedy at law

Indiana Code § 3-5-5-17 violates the Fourteenth Amendment's equal protection clause, violates the fundamental right to vote, and discriminates on the basis of disability in violation of the Rehabilitation Act and the Americans with Disabilities Act.  It has been repeatedly held that denial of constitutional rights is irreparable harm in and of itself.  "Courts have . . . held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights."  *Overstreet v. Lexington-Fayette*

---

[11]    In the event that the statute is deemed to be facially neutral, however, it clearly has a disparate impact on persons with disabilities: it affects *only* persons with disabilities.  And it also represents a failure to accommodate the disabilities of persons committed to state institutions: many of these persons have no alternative residence where they might vote, and others simply desire to vote where they actually live; a simple accommodation would be to permit persons to use the institution where they live as their residence for purposes of voting.

*Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002); *see also, e.g., Cohen v. Coahoma County, Miss.*, 805 F. Supp. 398, 406 (N.D. Miss. 1992) ("It has repeatedly been recognized by the federal courts at all levels that violation of constitutional rights constitutes irreparable harm as a matter of law.").  Moreover, the right here involves the right to vote and "[a] restriction on the fundamental right to vote . . .  constitutes irreparable injury." *Obama for America*, 697 F.3d at 436 (citing *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986)).

The next election date is the primary election set for May 3, 2016.  Indiana law requires that persons intending to vote in the primary register prior to the 28th day before the primary election, which is April 4, 2016. Ind. Code § 3-7-13-10.  The threatened irreparable harm, in the absence of a preliminary injunction, will therefore occur in the near future. There is no adequate remedy at law that can remedy this irreparable harm.  Only an injunction will prevent this harm.

**B.      The balance of harms favors granting the preliminary injunction**

If a preliminary injunction is not issued, then the plaintiffs and the putative class and subclass will suffer an irreparable harm for which there is no adequate remedy at law.  If the defendants are enjoined from enforcing the residency statute at issue and allow class members to register in the precinct where they are institutionalized, they will suffer no harm at all. Moreover, governmental entities cannot claim that being required to comply with the requirements of the Constitution is harmful.  *See Christian Legal Soc'y v. Walker,* 453 F.3d 853, 867 (7th Cir. 2006) (holding that if a governmental entity "is applying [a] policy in a manner that violates [the plaintiff's] First Amendment rights . . . then [the] claimed harm is no harm at all"). The balance of harms therefore favors the issuance of equitable relief.

**C.      A preliminary injunction is not against the public interest**

Granting a preliminary injunction here would not be against the public interest.  An

injunction that will "prevent disenfranchisement benefits the public."   *U.S. v. Alabama*, 857 F. Supp. 2d 1236, 1241 (M.D. Ala. 2012).   More generally, "[v]indication of constitutional freedoms is in the public interest."   *See, e.g.*, *McIntire v. Bethel School,* 804 F. Supp. 1415, 1429 (W.D. Okla. 1992) (internal citation and quotation omitted).   Allowing Ms. Featherston and the class and subclass members to register and vote in the precincts where they are institutionalized is, ultimately, in the public interest to preserve their constitutional, fundamental rights. And, a preliminary injunction will advance "the public's interest in enforcement of the ADA and in elimination of discrimination on the basis of disability." *Hernandez v. County of Monterey*, 110 F. Supp. 3d 929, 958 (N.D. Calif. 2015) (footnote omitted).

> ### D.      The preliminary injunction should issue without bond

The grant of a preliminary injunction here will not threaten any monetary harm whatsoever to the defendants.  In the absence of such injury, no bond should be required.  *See, e.g.*, *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996).

**Conclusion**

As demonstrated above, all the requirements for the grant of a preliminary injunction in this case are satisfied.  Accordingly, this Court should enjoin the application of Ind. Code § 3-5-5-17 and should further enjoin the Clerk of Jefferson County, Indiana, from removing the voter registrations of Ms. Featherston and members of the putative subclass solely because they have listed the address of Madison State Hospital as their address for the purpose of establishing their place of residency to register to vote and to vote and, to the extent voter registrations have already been removed, the Clerk must be enjoined to reinstate the registrations.

*s/ Kenneth J. Falk*
Kenneth J. Falk
No. 6777-49

[21]

_s/ Gavin M. Rose_
Gavin M. Rose
No. 26565-53
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
grose@aclu-in.org




_s/ Melissa L. Keyes_
Melissa L. Keyes
No. 30152-49


_s/ Thomas E. Crishon_
Thomas E. Crishon
No. 28513-49


_s/ Grant E. Helms_
Grant E. Helms
No. 29953-49
Indiana Protection and Advocacy Services
4701 N. Keystone Ave.  – Suite 222
Indianapolis, IN 46205
317/722-5555
Fax:  317/722-5564
mkeyes@ipas.IN.gov
tcrishon@ipas.IN.gov
ghelms@ipas.IN.gov


Attorneys for Plaintiffs

[22]

## Certificate of Service

I hereby certify that on this  1st day of March, 2016, a copy of the foregoing was filed electronically with the Clerk of this Court. I was also mailed on this date to the following parties by first class U.S. postage, pre-paid, or via certified mail.

State of Indiana
c/o Governor Mike Pence
206 State House
200 West Washington St.
Indianapolis, IN 46204

The Indiana Secretary of State
201 State House
200 W. Washington St.
Indianapolis, IN 46204

Clerk
Jefferson County, Indiana
300 E. Main Street,  #203
Madison, IN  47250

The Individual Members of the Indiana Election Commission
c/o Office of the Secretary of State
201 State House
200 W. Washington St.
Indianapolis, IN 46204

s/ Kenneth J. Falk
Kenneth J. Falk
Attorney at Law

[23]